**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| MARK SNYDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: 2:07-CV-00433-PMD |
| v. | ) | |
| | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | **ORDER** |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on Defendant State Farm Mutual Automobile Insurance Company's ("State Farm") Motion for Summary Judgment pursuant to Federal Rule 12(b)(6). For the reasons set forth herein, Defendant's Motion is granted.

## BACKGROUND

On July 17, 2002 Plaintiff Mark Synder ("Snyder") was riding a bicycle when he was struck by a motor vehicle driven by Chris Knight ("Knight"). Knight was at fault in causing this accident. As a result of this accident, Snyder suffered very serious spinal injuries which left him partially disabled.

The vehicle driven by Knight had a $25,000 liability insurance policy with Nationwide Insurance Company ("Nationwide"). Knight also had an excess coverage policy on the vehicle through State Farm in the amount of $50,000, giving him $75,000 in total liability coverage on the vehicle. Snyder had a UIM coverage policy with State Farm in the amount of $100,000, and UIM coverage under a policy issued to Nicole Bufano that provided $15,000 of coverage in the event of being a pedestrian involved in an accident. This gave Snyder a total UIM coverage amount of $115,000.

On January 19, 2004, Snyder received the $25,000 in liability insurance from Nationwide. On June 28, 2004, Snyder sued Knight in the Court of Common Pleas of Charleston County. State Farm retained counsel to defend the case, as provided for in § 38-77-160 of the South Carolina Code. In November 2005, after the completion of discovery in the case, Snyder received the $50,000 coverage limit from State Farm under Knight's excess liability policy.

Throughout this time period, State Farm claim representative Jane Coleman ("Coleman") was researching Snyder's claim for payments under Knight's UIM policy. Coleman requested copies of all of Snyder's medical records. State Farm determined that Snyder's medical claims were worth between $75,000 and $100,000. Given that Snyder had received $75,000 in liability coverage, State Farm believed that this meant that Snyder was only entitled to receive between zero and $25,000 in UIM coverage. Snyder's evaluation of his medical claims was, unsurprisingly, dramatically different in valuation. Snyder, through his attorney, made a written demand for $300,000, or the $115,000 in policy limits of Snyder's UIM policies.

The two sides commenced settlement negotiations. On November 15, 2005, Plaintiff contacted State Farm and offered to settle the case for the limits of Snyder's UIM coverage, excluding the UIM coverage to which he was entitled under Bufano's policy, in the amount of $100,000. On December 28, State Farm responded with a counteroffer of a summary jury trial, in which Snyder would have had a minimum recovery of nothing, a maximum recovery of $115,000, would have had to go through a trial, and would have been precluded from appealing the jury's verdict and from asserting a claim against State Farm for bad faith. On January 11, 2006, Plaintiff responded with a counteroffer of a summary jury trial at which the minimum recovery was fixed at $50,000. On January 13, State Farm responded to this by proposing a summary jury trial at which

2

the minimum recovery was set at $25,000.[1]

On January 30, 2006, Plaintiff again contacted State Farm and offered to settle for his UIM policy limit of $100,000. State Farm refused this offer. The week before the case was to go to trial, Plaintiff contacted State Farm and offered to settle the case for $75,000. Once again, State Farm refused. Finally, on the day the trial was to begin, Plaintiff reduced his demand to $50,000 if State Farm would settle before opening statements. State Farm refused this offer as well.

At no point in the settlement negotiations did State Farm propose any offer which would not have forced Snyder to go through some sort of trial to get his UIM benefits. While State Farm did propose that Snyder could go to a summary jury trial where the jury would have to award him at least $25,000, Snyder never had the option of simply taking the $25,000 payment. This is amply supported by the record, and is acknowledged numerous times by State Farm employees involved with the case during deposition testimony.[2]

Snyder declined to go to a summary jury trial, and instead took the case to full trial in the Court of Common Pleas. The trial took place in February 2006. Shortly before trial, Snyder visited

---

[1] The parties are in dispute about whether Plaintiff's counsel recommended to Snyder that he accept this offer. State Farm asserts that Plaintiff's counsel represented to State Farm's counsel that he had passed the offer along to Snyder along with a recommendation that he accept the offer. Plaintiff, on the other hand, vigorously denies that this ever occurred.

[2] For example, at her deposition, Coleman was asked, "Did you ever make Mr. Snyder an offer that would not require some sort of trial in the case?" Coleman answered, "No. All of my offers were attached to a summary jury trial, but I did not feel that his claims value exceeded what he had already been compensated. . ." (Coleman Depo. at 72.) *See also id.* at 62-63 ("[W]e were always offering the 25,000 on a summary jury trial. We never offered it without a summary jury trial."). On an internal State Farm document entitled "First-Party Pre-Trial Review Form" this is also emphasized. In the section entitled "Last Offer:," the form reads "No offer has been made to date." (Pl's Ex. 11.) The "State Farm Post Trial Report" also recognizes that "[n]o offers of UIM money" were made. *Id.*

3

his physician and learned that he would need additional surgery. Snyder attempted to delay the trial in order to depose this physician and get more information regarding this new condition so that this information could be brought before the jury, but State Farm refused to consent to the delay. At the conclusion of the trial, the jury returned a verdict for Snyder against Knight in the amount of $345,000. At this point, State Farm paid Snyder the maximum limit of his UIM coverage in the amount of $115,000.[3] Upon receiving these UIM forms, Plaintiff signed a form acknowledging full satisfaction of the verdict. While Plaintiff certainly expressed a preference not to experience the stress of going through a trial, it is not disputed that Snyder benefitted from the trial financially.[4]

On January 23, 2007, Snyder filed suit in the Charleston County Court of Common Pleas against State Farm for negligence, bad faith refusal to pay benefits, unfair trade practices, breach of contract, improper claims practices, and waiver and estoppel. Snyder is seeking actual and punitive damages, as well as litigation costs. State Farm removed this action to federal court on February

---

[3] There was, however, some dispute regarding the availability of the $15,000 in UIM coverage provided by Ms. Bufano's policy. Snyder and Bufano were never formally married, but have held themselves out to be common law husband and wife for a substantial period of time. In October 2005, State Farm sent Snyder a letter seeking to confirm that Snyder was no longer making a UIM claim under Bufano's policy since "plaintiff cannot establish a common law marital relationship." (Pl.'s Ex. 4.) Then, despite the fact that the claim adjuster Coleman had determined that Snyder and Bufano were married and Snyder had coverage under Bufano's UIM policy, State Farm's counsel proposed that the issue of the validity of Snyder's and Bufano's marital relationship be bifurcated from the negligence cause of action at trial. This motion was denied by the state court on the first day of the trial. After this motion was denied, however, State Farm conceded the issue and did not challenge the relationship any further.

[4] Snyder's agreement with his attorney provided for a 33% contingency fee in the event of a settlement, and a 40% contingency fee in the event of a trial. After trial, then, Snyder received 60% of the $115,000 payment of UIM benefits, or $69,000. Had State Farm accepted the $50,000 settlement offer, Snyder would have received 67% of this, or $33,500. Even had State Farm accepted Snyder's initial $100,000 demand, he would have recovered $67,000, less than he received from the trial verdict.

13, on the basis of diversity jurisdiction. After the conclusion of discovery, on November 26, State

Farm moved for summary judgment in this matter. On January 4, 2008, Plaintiff issued a Response

in Opposition to this motion. Defendant replied to this on January 7. Plaintiff filed a Sur Reply on

January 11.[5]

## STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue

as to any material fact." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence but rather

must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249 (1986). All evidence should be viewed in the light most favorable to the nonmoving party.

*Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). "[W]here the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition

by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d

115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

---

[5] State Farm's Reply and Snyder's Sur Reply are largely dedicated to the issue of whether Plaintiff's counsel, in Plaintiff's Response in Opposition to State Farm's Motion for Summary Judgment, impermissibly blurred the line between advocate and witness by making factual statements in the Response that were unsupported anywhere in the record. A plaintiff may not seek to establish an issue of material fact by having an attorney make factual statements in pleadings which are otherwise unsupported in the case's record. Such representations are not evidence and will not be considered as evidence. However, to the extent such improper statements were made in the Response, they concerned matters of relatively minor importance to this litigation, and the court sees no need to take dramatic corrective measures such as removing Mr. Wigger as Plaintiff's counsel.

(1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex*, 477 U.S. at 327.

## ANALYSIS

### I.    Snyder's Claim for Bad Faith Refusal to Pay

"[I]f an insured can demonstrate bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance contract, he can recover consequential damages in a tort action." *Nichols v. State Farm Mut. Auto. Ins. Co.*, 279 S.C. 336, 340, 306 S.E.2d 616, 619 (1983). Furthermore, a bad faith claim may exist even in the absence of any violation of an insurance contract provision, as "the benefits due an insured are not limited solely by those expressly set out in the contract." *Tadlock Painting Co. v. Maryland Cas. Co.*, 322 S.C. 498, 503, 473 S.E.2d 52, 55 (1996). The elements of a bad faith refusal to pay action are: (1) the existence of a contract of insurance between the parties; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action; and (4) causing damage to the insured. *Howard v. State Farm Mut. Auto. Ins. Co.*, 316 S.C. 445, 451, 450 S.E.2d 582, 586 (1994). It is undisputed here that Snyder and State Farm had an insurance contract for UIM coverage, and it is undisputed that State Farm was unwilling to pay Snyder benefits pursuant to that contract, to which a jury ultimately found that he was entitled. What is left for the court to decide on Snyder's bad faith refusal to pay claim, then, is whether this refusal was a result of bad faith or unreasonableness on the part of State Farm, and whether this caused damage to Snyder.

6

The first issue the court must decide is whether State Farm did, in fact, have a duty to act in good faith toward Snyder.  This court's decision in *Myers v. State Farm Mutual Automobile Insurance Co.* addressed the issue of when the insurer of a UIM policy has a duty to act in good faith.  950 F. Supp. 148 (D.S.C. 1997)**.**  That case involved a plaintiff who had filed suit against the at-fault driver, served notice of this claim to her UIM insurer, and then settled her claims against the at-fault driver.  At this point, the UIM insurer refused to pay the plaintiff her UIM benefits, and plaintiff sued the insurer for bad faith refusal to pay claims.  Distinguishing a South Carolina Supreme Court case, *Williams v. Selective Insurance Co. of the Southeast*, 315 S.C. 532, 446 S.E.2d 402 (1994), in which that court had held that a UIM insurer was not liable for bad faith where the insured had failed to pursue an action against the at-fault motorist, the *Myers* court characterized the holding of *Williams* as:

> merely requir[ing] that the insured bring suit against the at-fault driver and serve the suit papers on the insured's underinsured carrier before any suit can be brought by the insured against this carrier; *Williams* does not address the issue of *when* the insured may bring a suit against his own carrier for bad faith after bringing suit against the tortfeasor as aforesaid.

*Id*. at 150.  The court concluded that the insurer's duty of good faith arose, at the latest, "after the insured brings suit against the at-fault driver and serves the carrier with process."  *Id*.  The court also acknowledged that "[i]t could well be argued that the carrier's duty to act in good faith and deal fairly with the insured arises at the moment the underinsured policy is purchased . . ."  *Id*. at n.1.  However, this issue of the precise chronological genesis of an insurer's good faith duty to pay or settle UIM benefits in the absence of a legal determination of fault on the other party was an issue that the court declined to conclusively decide, writing "[b]ecause of the facts in this case, this Court does not need to, and does not, decide whether the insurer's duty to act in good faith arises at the

moment the underinsured policy is written." *Id*. This court has recently explicitly followed the rule of *Myers* that a UIM insurer's duty of good faith arises when the insured has filed a claim against the at-fault driver. *Halmon v. Am. Int'l Group, Inc. Ins. Co.*, C.A. No.: 2:07-01215-PMD (D.S.C. Dec. 5, 2007).

Here, the facts are slightly different, in that State Farm did have every opportunity to defend its own interests, as it took over the defense of Knight's case in the trial. However, the factual distinctions do not change the law of *Myers*, which is that once a UIM insured commences a claim for liability against the allegedly at-fault driver, the UIM insurer has a duty to act in good faith towards the insured. The court holds, then, that since Snyder had initiated an action against Knight, State Farm had a duty to deal with Snyder in good faith.

However, a duty to deal in good faith does not necessarily entail a duty to make a settlement offer. South Carolina law most assuredly recognizes a cause of action for bad faith refusal to pay benefits to a first-party insured. *Nichols*, 279 S.C. 336, 306 S.E.2d 616. However, Plaintiff misinterprets the law when he states "bad faith exists when a carrier forces someone to go to court to get the benefits he paid for." (Pl.'s Mem. in Opp'n at 13.)

"If there is a reasonable ground for contesting a claim, there is no bad faith." *Crossley v. State Farm Mut. Auto. Ins. Co.*, 307 S.C. 354, 360, 415 S.E.2d 393, 397 (1992). The law certainly does not require every insured with UIM coverage who has initiated an action against an at-fault driver to receive a settlement offer for some money. The reality is that some claims would be frivolous, and insurers must have the ability to protect their own interests (and, by extension, the interests of their other premium-paying customers) by taking over the defense of the at-fault driver where the insured's claims are without merit. S.C. Code Ann. 38-77-160.

One situation in which South Carolina law does impose a duty to settle is in a liability case in which the insurer assumes the defense of the insured and the insured may potentially be exposed to liability above and beyond the policy limits. *Tyger River Pine Co. v. Maryland Cas. Co.*, 170 S.C. 286, 170 S.E. 346 (1933). However, that is not the case here, where the underlying dispute was between the insurer and the first-party insured. *Myers* is the only case to date to have addressed the issue of whether such a duty exists in the first-party UIM context, and it wrote that "in cases of liability where it is clear that damages have been suffered by the insured that are greatly in excess of the tortfeasors' policy limits, the underinsured carrier may have a duty to make a settlement offer prior to its insured obtaining a judgment against, or exhausting the policy limits of, the tortfeasor." 950 F. Supp. at 151. The *Myers* court stopped well short of imposing upon first-party UIM insurers a duty to settle similar to the duty imposed upon liability insurers by the South Carolina Supreme Court in *Tyger River*. *Myers* simply held that if it was "clear" that the insured suffered damages "greatly in excess" of the liability limits of the at-fault party, the insurer could not in bad faith delay or withhold benefits to which it was certain that the insured was entitled. The question before the court, then, is whether State Farm's actions, taken in the light most favorable to Snyder, were in bad faith, or whether State Farm had a "reasonable ground" for contesting Snyder's claim.

According to Plaintiff, "[t]he insured's carrier has the duty to act in good faith toward, and deal fairly with its insured by investigating and processing the underinsurance claim, and, in cases of liability where it is clear that damages have been suffered by the insured that are greatly in excess of the tortfeasor's policy limits, the underinsured carrier may have a duty to make a settlement offer prior to its obtaining a judgment against, or exhausting the policy limits of the tortfeasor. Clearly, Defendant State Farm was negligent in their handling of the claim and in their unreasonable refusal

to pay the benefits due to the plaintiff."  (Pl.'s Mem. in Opposition at 16-17.)

The court does not share Plaintiff's view that State Farm was "negligent" or that their reluctance to offer Snyder UIM benefits was "unreasonable."  As an initial matter, the court finds that State Farm did in fact make Plaintiff a settlement offer.  While unusual, State Farm's offer of a summary jury trial with a minimum award of $25,000 and a maximum of $115,000 was an offer for a settlement.  The fact is that had Snyder chosen to accept this offer, he was guaranteed a minimum of $25,000 in UIM benefits in addition to the $75,000 he had previously received from Knight's liability coverage.  State Farm indicated that if Snyder took this agreement, it would have disbursed the $25,000 at that point (before the summary jury trial), so he would have had that money immediately upon entering into the settlement agreement.  (Coleman Depo. at 62.)

The court fails to see how this is legally distinguishable from a flat offer of $25,000, which Snyder seems to have indicated in deposition testimony that he would not have been inclined to accept anyway.  (Snyder Depo. at 43.)  The court understands that there is inconvenience and anxiety associated with going through a summary trial, arbitration, or mediation, but in this case such inconvenience was offset by the possibility that the summary trial would have given Snyder the opportunity to recover substantially more than the $25,000 minimum proposed by State Farm. While it is certainly puzzling why State Farm did not also give Snyder the option of a simple settlement amount, it is not the role of the courts to impose rigid rules and guidelines upon the conduct of parties in the settlement process.  Settlement negotiations are best served by as much flexibility as possible so long as the parties are negotiating in good faith, as this allows both parties to make proposals which are best suited to serve their particular needs.  Artificial constraints or requirements placed upon the options available to the bargaining parties would generally only serve

10

to frustrate attempts to reach a mutually agreeable settlement.

Furthermore, Plaintiff has not established any evidence beyond mere assertions and inferences that State Farm's actions were in bad faith. The uncontested evidence presented by State Farm shows that there were two separate internal evaluations of Snyder's bodily injury claim. The evaluation prepared by Coleman and other State Farm adjusters valued Snyder's claim at between $75,000 and $100,000. (Coleman Affidavit ¶ 14.) A separate evaluation prepared by State Farm's attorney at trial, John McDonald ("McDonald") valued Snyder's claim at between $60,000 and $150,000. (McDonald Affidavit ¶ 8.) Since Snyder's claim value would be offset by the $75,000 he had already received from Knight's liability insurance, this means that Coleman estimated the amount of UIM coverage owed to Snyder at between zero and $25,000, and that McDonald estimated this amount at between zero and $75,000.

The South Carolina Supreme Court has held that an insurer cannot merely rely upon the results of its own investigation to insulate itself from summary judgment, because doing so would "effectually insulate[] the insurer from liability" and "foreclose[] a jury consideration of the insured's evidence of bad faith." *Vanadore v. Nationwide Mut. Ins. Co.*, 289 S.C. 155, 158, 345 S.E.2d 711, 713 (1986). Here, however, unlike the insurer in *Vanadore*, State Farm is not merely basing its claim that its actions were reasonable upon its own secretive internal reports, but on all the evidence available in the case as well. There is no evidence in the record that State Farm's internal analysis of the strength of Snyder's bodily injury claim was unreasonable. Snyder's actual medical bills were $34,345.70. (Pl.'s Ex. 11.) His lost wages were $6,436.63. *Id*. While Snyder's salary had been reduced, it is unclear whether this was related to the accident, as his employer was apparently going through financial difficulty at the time, and after two years it was raised back to

11

its previous level.  *Id.*  Snyder had also been diagnosed with a 10% disability due to his spinal injuries.  *Id.*  While he was no longer able to perform physically demanding activities such as riding his bike, he was still apparently able to perform most routine tasks in his day-to-day life.  The basis for State Farm's estimates of Snyder's bodily injury claim, then, was the approximately $40,000 in actual damages and the long-term disability and pain and suffering damages resulting from a 10% disability.  Given this, the court cannot find that State Farm's estimates of between $75,000 and $125,000 and between $60,000 and $150,000 were unreasonable.

    Furthermore, it is simply illogical that State Farm would have behaved in the manner alleged by the Plaintiff.  Even had State Farm been solely concerned with saving itself as much money as possible under the circumstances, it would not have taken the course of action it took in the present case had it known what the jury was going to award Snyder on his bodily injury claim.  If, as required by *Myers*, it were "clear" to State Farm that Snyder suffered damages "greatly in excess" of Knight's $75,000 liability limit, no rational explanation has been offered, and there is none that the court can discern, as to how State Farm's actions would have somehow resulted in State Farm avoiding having to pay Snyder the benefits due to him.

    If State Farm knew that Snyder's claim was worth in excess of $180,000 (the $75,000 in Knight's liability coverage plus the $115,000 in UIM coverage through his policy and Bufano's policy), the last course of action it would have wanted to take would have been to insist upon taking Snyder to trial where he would have an opportunity to put his case before a jury.  State Farm would have been more proactive in settlement negotiations.  Most obviously, if it were "clear" to State Farm that Snyder's claim had been worth that much, there is simply no reasonable explanation for why they would not have accepted Snyder's offer of settling the case for $50,000 on the morning

of trial. All the evidence in the record, taken together, reveals that State Farm simply made an erroneous (and costly) miscalculation as to how much money a jury was likely to award Snyder for his injuries. A miscalculation such as this is not a basis for determining that an insurer's conduct was unreasonable or in bad faith–to rule otherwise would run the risk of turning every case in which an insurer and an insured were not able to reach a settlement and the insured went on to win a large verdict into a case for bad faith refusal to pay against the insurer.

Accordingly, the court holds that while State Farm did have a duty to deal with Snyder in good faith, it made Snyder a settlement offer and its conduct was reasonable under all of the circumstances, and Plaintiff has not established an issue of material fact as to his claim of bad faith refusal to pay.[6] Therefore, Defendant's Motion for Summary Judgment on this claim is granted.

## II.    Snyder's Claim for Negligence and Gross Negligence

Snyder has also asserted a claim for negligence and gross negligence. In support of this claim, Plaintiff cites South Carolina Code § 38-59-20, the Claims Practices Act, which, although it does not provide a private right of action, Plaintiff asserts serves as a guidepost for "what South Carolina considers bad faith and what type of practices can lead to a finding of bad faith." (Pl.'s Mem. in Opp'n at 16.) Plaintiff explicitly ties his negligence claim to whether State Farm acted unreasonably or in bad faith:

> "Speaking of the insurer's duty of 'good faith' and 'fair' dealing is somewhat misleading because the duty can be breached not only by 'bad faith' but also by such misconduct as 'unreasonable' refusal to pay. In other words, it can be breached by negligence, because only this standard can meaningfully address the inequality in the

---

[6] Because the court holds that Plaintiff has not established an issue of material fact as to whether State Farm acted in bad faith, the court need not and does not delve into the issue of whether Plaintiff's bad faith refusal to pay cause of action fails as a matter of law because he did not suffer any sort of damages as a result of State Farm's unwillingness to settle the case.

relationship between the insurer and the insured."

*Id*. at 15 (quoting *The South Carolina Law of Torts, Second Edition* (Hubbard 1997)).

Plaintiff asserts that State Farm was negligent because its conduct was not in accordance with § 38-59-20, which provides:

> Any of the following acts by an insurer doing accident and health insurance, property insurance, casualty insurance, surety insurance, marine insurance, or title insurance business, if committed without just cause and performed with such frequency as to indicate a general business practice, constitutes improper claim practices:
>
> > (5) Compelling policyholders or claimants, including third-party claimants under liability policies, to institute suits to recover amounts reasonably due or payable with respect to claims arising under its policies by offering substantially less than the amounts ultimately recovered through suits brought by the claimants or through settlements with their attorneys employed as the result of the inability of the claimants to effect reasonable settlements with the insurers.

S.C. Code Ann. § 38-59-20.  For Plaintiff to base his claim of negligence and gross negligence on this particular statutory provision misunderstands the purpose of this law.  The Claims Practices Act is clearly aimed at conduct that is "performed with such frequency as to indicate a general business practice," and does not provide grounds for a private cause of action, but rather gives guidelines for administrative enforcement by the Department of Insurance.  If Plaintiff's interpretation of § 38-59-20(5) were the law, an insurer would seemingly be negligent every time a jury awarded an insured a verdict that was substantially more than the insurer's settlement offer.  Estimating likely jury verdicts is by its very nature an unpredictable pursuit, and from time to time juries are bound to return verdicts that are either substantially more or substantially less than the insurer's estimates upon which its settlement offers were based.  The Claims Practices Act is not directed at those situations, but is rather designed to give the Department of Insurance guidelines to seek out and administratively deal with insurers who are consistently, systematically making "lowball" settlement

14

offers to insureds.  In the present case, Plaintiff has neither made any allegations nor shown any evidence that State Farm has a pattern of such practices.

Furthermore, as discussed in the previous section, Plaintiff has simply failed to establish an issue of material fact as to whether State Farm acted unreasonably or in bad faith.  The record taken as a whole indicates merely that State Farm substantially miscalculated what a jury would award Snyder for his bodily injuries.  This only shows that State Farm happened to be wrong, not that they acted unreasonably, negligently, or in bad faith.

Accordingly, Plaintiff has failed to establish an issue of material fact as to whether State Farm acted with negligence or gross negligence, and Defendant's Motion for Summary Judgment is granted on this claim.

### III.    Snyder's Claim for Breach of Contract

Snyder has asserted a claim that State Farm breached the terms of its UIM policy agreement. Plaintiff's claim on this cause of action is virtually identical to the grounds for his bad faith failure to pay benefits and negligence grounds–specifically, that State Farm had a contractual obligation to deal with Snyder in good faith and to attempt to settle the case if it believed that Snyder's claim was worth substantially more than the $75,000 he had already received from Knight's liability coverage.      There is no provision of the contract between Snyder and State Farm that required State Farm to disburse any of Snyder's UIM benefits prior to the entry of a formal entry of judgment against Knight in excess of Knight's liability coverage limits.  It is undisputed that after the jury entered its verdict that Knight was liable to Snyder in the amount of $345,000, State Farm promptly paid Snyder the maximum limits under his and Bufano's UIM policies in the amount of $115,000.

15

Plaintiff claims that the contractual relationship between Snyder and State Farm gave rise to a duty of good faith on the part of State Farm. "The duty of good faith and fair dealing is such a duty that arises by operation of law due to the special relationship of the parties in an insurance contract." *Tadlock*, 322 S.C. at 503 n.5, 473 S.E.2d at 55 n.5. There is "an implied covenant of good faith and fair dealing in every insurance contract 'that neither party will do anything to impair the other's rights to receive benefits under the contract.' " *Id.* at 500, 53 (quoting *Nichols*, 279 S.C. at 339, 306 S.E.2d at 618).

However, as discussed in previous sections, Plaintiff has failed to establish an issue of material fact on the issue of whether State Farm acted in bad faith or not. There has been no evidence presented that Defendant did anything other than erroneously estimate the overall value of Snyder's bodily injury claim, which was simply making a costly mistake, not acting in bad faith.

Accordingly, Plaintiff can point to no specific provision of the contract that State Farm violated, and cannot establish an issue of material fact to support his claim that State Farm violated its contractual duty to deal with Snyder in good faith. Therefore, Plaintiff's claim that State Farm breached the contract in question fails as a matter of law, and the court grants Defendant's Motion for Summary Judgment on this cause of action.

## IV. Snyder's Claims Under the Insurance Trade Practices Act and Claims Practice Act

Snyder has asserted a claim that State Farm's actions in this case constituted a violation of the Insurance Trade Practices Act. S.C. Code Ann. § 38-57-10. Snyder has also asserted a claim that State Farm's actions in this case constituted a violation of the Claims Practices Act. S.C. Code Ann. § 38-59-20. However, the South Carolina Supreme Court has explicitly held that both § 38-57-

10 and § 38-59-20 create no private right of action. *Masterclean, Inc. v. Star Ins. Co.*, 347 S.C. 405, 415, 556 S.E.2d 371, 377 (2001). Therefore, the appropriate channel for Plaintiff's assertions that State Farm violated § 38-57-10 and § 38-59-20 would have been an administrative complaint through the Department of Insurance.

Accordingly, Plaintiff's claims for relief under § 38-57-10 and § 38-59-20 fail as a matter of law, and Defendant's Motion for Summary Judgment on these claims is granted.

**V.      Is State Farm Entitled to Summary Judgment on the Plaintiff's Waiver and Estoppel Claim?**

Snyder also alleges that State Farm's actions in the present case constitute a waiver of its right to deny Snyder's claims. Plaintiff does not elaborate upon the basis for this allegation in the Complaint or anywhere else in the pleadings. Waiver is the principle that a party cannot explicitly relinquish a right and then reassert it at a later time. However, State Farm's UIM policy with Snyder only provided that State Farm would insure Snyder for any bodily injury suffered by him or his agent above and beyond the liability limits of the at-fault party. State Farm never waived the ability to contest in good faith the exact amount of the bodily injury suffered by Snyder.

Similarly, Plaintiff never elaborates on the basis for his alleged claim for estoppel. Estoppel occurs when a party misrepresents material facts to the detrimental reliance of the other party. Snyder has simply not made any sufficient allegations of such misrepresentations anywhere in the pleadings.

Accordingly, Plaintiff's claims against Defendant for waiver and estoppel fail as a matter of law, and the court grants Defendant's Motion for Summary Judgment on each of these claims.

17

## CONCLUSION

For the foregoing reasons, the court finds that the Plaintiff Mark Snyder has failed to establish an issue of material fact on any of his claims against Defendant State Farm Mutual Automobile Insurance Company in this action.  It is therefore **ORDERED** that Defendant's Motion for Summary Judgment be **GRANTED**.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**February 22, 2008**

18